UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WILLIAM FRANCISCO COUNTS,
    Plaintiff,

v.                                              Case No. 13-CV-0518

WILLIAM POLLARD,
JESSE SCHNEIDER,
BRIAN GREFF,
SHANE WALLER,
MATTHEW BURNS,
JEFF D. GILL,
JEREMY L. STANIC, and
JUSTEN S. KITZMAN,
    Defendants,

## DECISION AND ORDER

William Francisco Counts, is proceeding pro se on the following claims under 42 U.S.C. § 1983: (1) Eighth Amendment claims against defendants Schneider, Burns, Kitzman, Gill, and Staniec for using excessive force on plaintiff during an incident on January 10, 2013; (2) Eighth Amendment claims against defendants Waller and Greff for failing to intervene during the use of force incident on January 10, 2013; (3) an Eighth Amendment claim against Pollard for failing to prevent or remedy plaintiff's suffering; and (4) an Eighth Amendment claim against Schneider for deliberate indifference to plaintiff's medical needs.

Before me now is defendants' motion for summary judgment. Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I take the evidence in the light most favorable to the non-moving

party and may grant the motion only if no reasonable juror could find for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255 (1986).

## I. BACKGROUND

Plaintiff, a state prisoner, was housed at Waupun Correctional Institution (Waupun) at all times relevant to this action. Defendants were all Wisconsin Department of Corrections employees working at Waupun.

On January 10, 2013, Correctional Officer Burns was collecting inmate lunch trays from the cells of the inmates in the segregation unit at Waupun. When Burns approached plaintiff's cell, A110, plaintiff handed his tray out of his trap door, put his arm out, and held onto the trap, keeping the trap open. Plaintiff told Burns he wanted his "current events" and demanded to speak to the sergeant. Current Events is a sheet of paper that Waupun staff put together for inmates to keep them informed of events occurring inside the institution. Burns told plaintiff to remove his arm from the trap, but plaintiff refused. Burns continued to collect lunch trays from other inmates and notified the sergeant on duty of the incident.

Around the time Burns left plaintiff's cell, psychiatrist Dr. Ralph Froelich arrived at cell A110 to speak with plaintiff. Dr. Froelich completed a Psychiatric Report regarding this meeting. In the mental status examination section, he wrote:

> Mr. Counts was seen on A Range where he had his hand through the trapdoor and was looking at me through his cell window. He remained in that position for the entire meeting. He was reporting that he was feeling agitated and had recently been transferred to A range because of behavioral disruption. He was negative and confronting. His mood was angry. His affect was consistent with his mood.

Declaration of Belinda Schrubbe, ¶ 7, Exhibit 1011, p. 1, ECF No. 37.

After Dr. Froelich left plaintiff's cell, Lt. Schneider arrived. Lt. Schneider avers that he informed plaintiff that he would be placed on restrictions for his disruptive behavior. Plaintiff disputes this. He says that Lt. Schneider arrived and requested that plaintiff place his hands out of the trap even though plaintiff already had his arm out of the cell to be cuffed to the rear. Plaintiff says he only held the trap to get the sergeant's attention; he wanted to talk to the sergeant about not getting his current events like everyone else. Defendant Waller told plaintiff that current events are not a right, they are a privilege.

Lt. Schneider insisted that plaintiff put his hands out to the rear to be cuffed. Lt. Schneider then tried to pull plaintiff's arm through the trap. Plaintiff pulled his arm back into the cell. Lt. Schneider asked plaintiff, "are you coming out?" Decl. in Supp. of Pl.'s Mot. in Opp'n to Defs.' Summ. J. (Plaintiff's Declaration), ¶ 8, ECF No. 43. Plaintiff said "yes, of course," but that he needed to pack up his property. Id. Lt. Schneider told plaintiff he would not be needing his property for awhile because plaintiff was going on control status. Plaintiff responded, "I'm not out of control, how can I go to control status? People don't go to control status for holding their traps." Id. Lt. Schneider said, "well you are." Id. Plaintiff told Lt. Schneider that placing him in control status for only holding his trap was against policy and that he (plaintiff) was not demonstrating disruptive or destructive behavior. Lt. Scheider, as he was walking away, sarcastically asked, "so you're refusing?" without opening the trap to give plaintiff the opportunity to place his hands out to be cuffed to the rear. Id. at 9. Plaintiff took the opportunity to pack his property in two paper bags.

Lt. Schneider then began assembling a cell extraction team. The team included Lt. Schneider as supervisor, Kitzman at pad one, Gill at pad two, Burns as team leader, and Staniec as the restraints officer. CO Ross was also present and responsible for video

3

documentation. The team gathered near the segregation bubble, team members put on safety equipment, and Lt. Schneider provided a brief explanation of the situation.

According to Lt. Schneider, plaintiff was laughing and yelling comments such as "This is what I wanted fat ass, come on in" when the team arrived at plaintiff's cell. Declaration of Jessie J. Schneider, ¶ 10, ECF No. 36. Plaintiff denies that he said this. Lt. Schneider directed plaintiff to turn around and place his hands out the trap behind his back. Plaintiff immediately complied with their directive; according to plaintiff, he had no intentions of ever refusing to come out of his cell or being combative. Team members secured plaintiff's arms and applied handcuffs onto plaintiff's wrists. The team opened the door to cell A110, tethered plaintiff to the door, and directed plaintiff to kneel. Inmates need to kneel in order for leg restraints to be applied. Plaintiff complied with the direction to kneel without issue. Once plaintiff was on his knees, the leg restraints were applied. Plaintiff complied with all directives during this time, and the team did not experience any issues removing plaintiff from cell A110 or applying restraints to his arms and legs. Because plaintiff had complied with all directives, Lt. Schneider informed CO Ross that video documentation would no longer be necessary and that he could return to his regular segregation duties. The team escorted plaintiff from cell A110 to strip cell #2. During the escort, plaintiff was wearing only a paper gown due to a clothing restriction. When they arrived at strip cell #2, a staff assisted strip search was conducted. No contraband was found during the search. Plaintiff avers that the staff-assisted strip search was degrading, especially since plaintiff was already on clothing restriction, had no clothes on, and was complying with staff's directives.

A towel was placed around plaintiff's waist, and the team escorted him to cell A104. Upon arrival at cell A104, the team secured plaintiff's wrist to the cell door with a tether strap and directed plaintiff to kneel. Plaintiff avers that correctional officers directed plaintiff to kneel and that he immediately complied, but he could only get one knee down to the ground because the tether cuff was so tight. Plaintiff also suggests that the position he was forced to kneel in was not a proper kneeling position for a rear cuff shackle removal. Plaintiff tried to place his left knee on the ground, but it just would not touch. The cuff kept riding up plaintiff's arm as he went down to kneel "and it hurt like hell." Plaintiff's Declaration, ¶ 16. Plaintiff informed staff of the problem; he told them he could not get his other knee down because the tether was too short.

Inmates need to kneel in order for leg restraints to be removed. For inmates who experience physical or medical problems kneeling, medical staff can issue a "no kneel" restriction. Plaintiff was not on a no-kneel restriction on January 10, 2013.

The staff screamed two times to kneel down. Plaintiff believes it was Gill screaming in his left ear. Plaintiff told them "I'm trying to, I'm trying to." Id. at ¶ 17. Plaintiff says staff then responded to his pleas by jumping on his back, causing unbearable pain. The tether cuff cut into plaintiff's wrist and rode up plaintiff's arm. Lt. Schneider threatened plaintiff with his taser, placed it against plaintiff's ribs, and screamed "get on your knees!" Id. at ¶ 18. Then, all of a sudden, plaintiff felt his legs get pulled out from under him. He was left suspended by the cuff, dangling from the door, with his legs sprawled out behind him. According to plaintiff, he was left in this position for several minutes. He screamed for help, but he was ignored. They finally stood plaintiff up and had to help him because he could not stand up on his own.

According to defendants, plaintiff placed one knee down on the ground and said, "I can't kneel down, I'm hooked to the fucking door." DPFOF, ¶ 45, ECF No. 50. The team suggests that they responded to plaintiff's inability to put both knees on the ground by assisting plaintiff to his knees. Defendants say plaintiff responded by physically resisting and struggling with team members, which plaintiff denies. The team responded to plaintiff's agitation and struggles by directing him to the ground, controlling his descent. Plaintiff says his descent was never controlled, only neglected, and he was left suspended by a tether hook to the door. Defendants say that plaintiff calmed down once he was on the ground, and they then removed the leg restraints. Plaintiff says that defendants removed the restraints while they pulled his legs out from under him.

The team closed the door to cell A104 and removed the remaining restraints through the trap. Lt. Schneider informed plaintiff he would be placed on control status due to his actions. Plaintiff was placed on control status around 11:30 a.m.

There is surveillance video of these events from cameras at the end of the hallway, but it is difficult to make out the details or see plaintiff behind the group of correctional officers. There also was hand-held video coverage of the removal of plaintiff from cell A110, but it was deleted because plaintiff cooperated with all directives and did not require a cell extraction or use of force during the removal from the cell.

Nurse DeYoung arrived at A range around 11:40 a.m. and performed a brief evaluation of plaintiff for potential injuries. Nurse DeYoung's notes state, "No obvious injuries. [Slight] mark to wrists – handcuffs. [Health Services Request] further injuries." Decl. of Belinda Schrubbe, ¶ 9, Exhibit 1001, p. 3, ECF No. 37. Nurse DeYoung did not issue a medical order for medication, such as aspirin, or medical supplies, such as ice or

6

bandages. Plaintiff says that he asked Nurse DeYoung for ice for the swelling of his wrist and bandages, but that DeYoung told plaintiff she had asked Lt. Schneider but he told her no. Plaintiff was left in control status with nothing at all.

At approximately 11:45 a.m., CO Burns was passing out medication to inmates on the lower A range. When Burns arrived at plaintiff's cell, Burns placed plaintiff's medication in a cup at the back of his cell trap. Plaintiff took the cup, but he refused to ingest the medication and instead placed the medication cup on the ledge of his window. The medication pass policy for inmates in segregation requires inmates to swallow the medication immediately in the presence of a correctional officer. Failure to abide by this policy results in disciplinary action and security precautions. Subsequently, correctional officers temporarily removed plaintiff from his cell and searched cell A104 for the medication. Correctional officers never found plaintiff's medication.

On January 11, 2013, plaintiff submitted a health service request (HSR) related to the incident on January 10, 2013. It was received January 12, 2013, and plaintiff was seen by Nurse Crystal Meserole in Waupun's health services department on January 15, 2013. In the notes from the appointment, the nurse wrote that plaintiff had a small scabbed-over abrasion on his left wrist and intermittent sharp pain. Plaintiff submits that the nurse overlooked his knee injuries even though she cleaned them. The nurse told plaintiff that he should submit another HSR if there was no improvement. Plaintiff did not submit any additional HSRs related to his alleged injuries from the incident on January 10, 2013. Plaintiff disputes this and points to another HSR he submitted on January 14, 2013, but that was also before his appointment with the nurse. Plaintiff was not issued, nor did he

request, a medical order for over-the-counter pain medication, such as aspirin, during the month of January 2013.

Plaintiff avers that he still has nerve damage from this incident, as well as scars on his wrist, knees and ankles. Plaintiff asked for photographs to document his injuries, but the security department told him that they do not take pictures of inmate injuries.

Burns drafted a conduct report for plaintiff for disobeying orders, misuse of prescription medication, and violation of institution policy and procedure. For charges issued in conduct reports, inmates have the right to a disciplinary hearing which affords due process to inmates for allegations made against them. Plaintiff was given a copy of his notice of hearing rights for conduct report #2343986, on January 11, 2013. The disciplinary hearing took place on January 29, 2013. Plaintiff attended his hearing. The hearing committee found plaintiff guilty of disobeying orders and misuse of prescription medication. The committee found plaintiff not guilty of violations of institution policies and procedures. Plaintiff submitted an appeal of the hearing officer's decision. Warden Pollard reviewed the appeal and affirmed the hearing officer's decision and sentence.

The DOC maintains an inmate complaint review system (ICRS) in Wisconsin adult correctional facilities. The purpose of the ICRS is to afford inmates in adult institutions a process by which grievances may be expeditiously raised, investigated, and decided. When an inmate at Waupun has a complaint, they are asked to utilize the ICRS.

Plaintiff submitted one offender complaint (WCI-2013-3922) with the Institution Complaint Examiner (ICE) related to the use of force incident on January 10, 2013. In the offender complaint, plaintiff alleged that the warden's decision pertaining to the appeal of the disciplinary hearing from his conduct report was an error. The ICE rejected the offender

complaint. Plaintiff submitted a request for review of rejected complaint. The reviewing authority affirmed the ICE's rejection.

Plaintiff avers that he had been assaulted in the shower room by many of the same officers on May 30, 2012. Plaintiff further avers that he tried to resolve these matters with Pollard a number of times, but Pollard never personally investigated plaintiff's allegations of abuse. In support of this contention, plaintiff submits (1) a letter he received from Larry Jenkins on January 29, 2013 (in response to a letter to Administrator Jess) that responds to general allegations of excessive force and procedures, without reference to specific instances; (2) a letter plaintiff sent to Pollard on March 18, 2013, about the January 10, 2013 incident; and (3) a memo plaintiff received from Pollard on May 2, 2013, which deals primarily with the May 30, 2012, incident.

## II. DISCUSSION

### A. Excessive Force

The Eighth Amendment's Cruel and Unusual Punishment Clause prohibits "unnecessary and wanton infliction of pain" on prisoners. Hudson v. McMillian, 503 U.S. 1, 5 (1992). In cases involving the use of excessive force, the question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7. In other words, plaintiff must show that either actual intent or deliberate indifference. Harper v. Albert, 400 F.3d 1052, 1065 (7th Cir. 2005). Factors in determining whether the use of force was wanton and unnecessary include "the need for an application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts

9

made to temper the severity of a forceful response.'" Hudson, 503 U.S. at 7 (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)).

Often circumstances require prison officials to balance the need "to maintain or restore discipline" against the risk of injury to inmates posed by the use of force. Id. at 6. Both situations require officials to act quickly and decisively. Id. Likewise, both implicate the principle that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Id. (internal citations and quotations omitted.)

Defendants Schneider, Burns, Kitzman, Gill, and Staniec argue that their use of force was necessary. In the alternative, they submit that they are entitled to qualified immunity. Plaintiff contends that genuine issues of material fact preclude summary judgment on plaintiff's use of force claim and that defendants unnecessarily used force upon plaintiff to cause harm rather than to maintain discipline applied in a good faith effort. Plaintiff points to several disputes of fact, including which officer removed the restraints, his assertion that he was assaulted, not decentralized, and his averment that he was forced to his knees.

"The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. To successfully oppose the motion, the nonmovant must present definite, competent evidence in rebuttal." Salvadori v. Franklin Sch. Dist., 293 F.3d 989, 996 (7th Cir. 2002). In this case, plaintiff has done so, in the form of his own declaration regarding the events and the declarations of other inmates.

Plaintiff's version of the events in Cell A104 differ drastically from defendants' version, both with regard to plaintiff's behavior and the actions defendants took to achieve compliance, to get plaintiff to kneel down, and to remove the leg restraints. As the Seventh Circuit noted in a recent decision, a person comparing plaintiff's version of events with that of the defendants "would be forgiven for thinking that each was recalling an entirely different event." Gonzalez v. City of Elgin, 578 F.3d 526, 529 (7th Cir. 2009).

> The standard of review governing summary judgment, however, resolves at least one question: we must accept all facts and reasonable inferences in the light most favorable to the non-moving party - here, the plaintiffs. We do not judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact.

Id. Taking all inferences in plaintiff's favor, I conclude that a reasonable juror could conclude that defendant's used excessive force in violation of the Eighth Amendment. Plaintiff asserts that he was cooperative and non-combative throughout the incident, and plaintiff's hands and legs were shackled and he was handcuffed to his cell, making the need for the use of force and any perceived threat to defendants minimal. Further, under plaintiff's version of events, defendants did nothing to temper the use of force. Thus, genuine issues of fact regarding the use of force preclude me from granting defendants' motion for summary judgment.

I further conclude that the factual dispute precludes dismissal of the claims based on qualified immunity. I have already determined that taken in the light most favorable to plaintiff, the facts alleged show a constitutional violation. See Saucier v. Katz, 533 U.S. 194, 201 (2001). Plaintiff alleges that, while handcuffed to his cell and in leg shackles, defendants jumped on his back, threatened him with a taser, pulled his legs out from

underneath him, and left him dangling by the wrists for several minutes. If plaintiff's version is true, this is a violation of a constitutional right that was clearly established at the time. Hope v. Pelzer, 536 U.S. 730, 738 (2002) (reasoning that shackling inmate to hitching post was "obvious" Eighth Amendment violation if, as inmate alleged, his threat to guards' safety had abated after he was subdued, handcuffed, and placed in leg irons). Further, if the fact finder concludes that defendants acted with malicious intent or deliberate indifference, then there is no question that a reasonable officer should reasonably have known that the conduct violated the Eighth Amendment. Hudson, 503 U.S. at 9 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated."); Hill v. Shelander, 992 F.2d 714, 718 (7th Cir. 1993) ("[I]f the finder of fact were to decide that [defendant] acted with malicious intent, there could be no question that a reasonable prison sergeant should reasonably have known that the conduct described by [plaintiff] violated the eighth amendment."). Thus, defendants are not entitled to qualified immunity on the excessive force claim.

## B. Failure to Intervene

For the same reasons, I cannot grant summary judgment in favor of defendants Waller and Greff on plaintiff's claim that they failed to intervene to prevent a constitutional violation. Only a defendant who is personally responsible for depriving the plaintiff of a constitutional right may be held liable under § 1983. Grieveson v. Anderson, 538 F.3d 763, 778 (7th Cir. 2008); Trujillo v. Williams, 465 F.3d 1201, 1227 (10th Cir. 2006); Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006). If someone else has committed the act that resulted in the constitutional deprivation, then the defendant is personally responsible, and thus liable under § 1983, only if he knows about the other person's act, has a realistic

opportunity to prevent it, but deliberately or recklessly fails to do so. Lewis v. Downey, 581 F.3d 467, 472 (7th Cir. 2009); Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir. 2002); Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). It is undisputed that defendants Waller and Gregg were present when plaintiff was moved on January 10, 2013. Each of their affidavits includes a version of what occurred inside cell A104 as plaintiff tried to kneel so defendants could remove his leg restraints. If defendants Waller and Gregg were in the hallway and could see and hear what was happening, they could have had a realistic opportunity to prevent it. Further, if the fact finder concludes that they did have a realistic opportunity to prevent it and deliberately or recklessly failed to do so, this is a violation of clearly established federal law. Therefore, this claim will survive summary judgment with the excessive force claim.

**C. Pollard**

Plaintiff was allowed to proceed on an Eighth Amendment claim against Pollard for failing to prevent or remedy plaintiff's suffering. Defendants stipulate that Pollard was made aware of allegations of excessive force, but they assert that this claim fails as a matter of law. Based on the evidence submitted by plaintiff, he did not write to Pollard about this incident until after it was over. Plaintiff complains that Pollard never personally investigated plaintiff's complaints of abuse by staff. However, that failure to investigate a prior incident is not the claim on which plaintiff was allowed to proceed. The claims in this case relate to January 10, 2013. Since Pollard was not present and had no realistic opportunity to prevent the actions of the other defendants, I will grant summary judgment in his favor. See Lewis v. Downey, 581 F.3d 467, 472 (7th Cir. 2009). Section 1983 limits liability to public

employees "for their own misdeeds, and not for anyone else's." Burks v. Raemisch, 555 F.3d 592, 595–96 (7th Cir.2009).

**D. Medical Care Claim**

Finally, plaintiff alleges an Eighth Amendment claim against Schneider for deliberate indifference to plaintiff's medical needs. This claim is based on plaintiff's averment that Schneider told Nurse DeYoung that plaintiff could not have ice for his wrist while in control status.

Defendants argue that plaintiff failed to exhaust his claim regarding the alleged denial of medical care, that plaintiff's injury was not a serious medical need, and that there was no deliberate indifference. Plaintiff argues that his medical care claim does not fail as a matter of law, that he appropriately grieved his medical claim in the context of his appeal from his conduct report disposition and offender complaint regarding the incident as a whole, and that an absence of serious injury is not a requirement to make a deliberate indifference claim.

Setting aside the arguments regarding exhaustion for the moment, I will consider plaintiff's medical care claim on the merits. The Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any punitive purpose. E.g., Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011). A claim based on deficient medical care must demonstrate two elements: (1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition. Id..

The burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one. Pyles v. Fahim, 771 F.3d 403, 408-09 (7th

Cir. 2014). The Seventh Circuit has held that injuries like a split lip and a swollen cheek do not rise to the level of an objectively serious medical need. Pinkston v. Madry, 440 F.3d 879, 891 (7th Cir. 2006). In another case, the court concluded that a one-inch laceration to an arrestee's temple, that was neither deep enough or long enough to require stitches, and a scraped elbow did not require prompt medical attention under the Eighth Amendment. Davis v. Jones, 936 F.2d 971, 972-73 (7th Cir. 1991). In this case, it appears that plaintiff's abrasion to his left wrist does not qualified as an injury "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Wynn v. Southward, 251 F.3d 588, 593 (7th Cir. 2001).

Even if I were to assume, for the purposes of argument only, that plaintiff had established an objectively serious medical need, he has presented no evidence that Schneider, who is not a medical professional, was deliberately indifferent to that hypothetical need. Although Nurse DeYoung may have asked if plaintiff could have some ice, she did not make a finding in her notes that ice was necessary for plaintiff's injuries. If Schneider, in fact, denied such a request because plaintiff was on control status, that does not constitute deliberate indifference, which requires that the prison official knew of "a substantial risk of harm to the inmate and disregarded the risk." Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005). There was no substantial risk of harm to plaintiff if he did not receive ice for his wrist.

Overall, there was no deliberate indifference in the medical care plaintiff received. Plaintiff was seen by a nurse ten minutes after the incident ended and he was placed on control status. The nurse did not consider any medical treatment, medication, or supplies necessary. Plaintiff submitted two HSRs, which were received on January 12, 2013, and

January 14, 2013. He was seen by a nurse in the HSU on January 15, 2013, and only an abrasion on his left wrist was noted. Plaintiff also complained of sharp pain and suggests the nurse overlooked the injuries to his knees. He was told to submit another HSR if there was no improvement, but he submitted no other HSRs regarding these injuries. Nor did plaintiff request any over the counter pain medication in January 2013.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion for summary judgment (Docket #26) is **GRANTED in part and DENIED in part**.

IT IS FURTHER ORDERED that William Pollard is **DISMISSED** as a defendant to this action.

Dated at Milwaukee, Wisconsin, this 30th day of March, 2015.

            s/ Lynn Adelman
            _____
            LYNN ADELMAN
            District Judge